1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10  STEPHANIE LARA,                    ) 1:03-cv-6946-SMS
                                       )
11              Plaintiff,             ) DECISION AND ORDER DENYING
                                       ) PLAINTIFF'S SOCIAL SECURITY
12        v.                           ) COMPLAINT (DOC. 1)
                                       )
13  JO ANNE B. BARNHART,               ) ORDER DIRECTING THE ENTRY OF
    Commissioner of Social             ) JUDGMENT FOR DEFENDANT JO ANNE B.
14  Security,                          ) BARNHART, COMMISSIONER OF SOCIAL
                                       ) SECURITY, AND AGAINST PLAINTIFF
15              Defendant.             ) STEPHANIE LARA
                                       )
16  _____   )
17

18        Plaintiff is proceeding in forma pauperis and with counsel

19   against the Commissioner of Social Security. Plaintiff seeks

20   judicial review of a final decision of the Commissioner denying

21   an application for Supplemental Security Income (SSI) benefits

22   under Title XVI of the Social Security Act (the Act). Pursuant to

23   28 U.S.C. § 636(c)(1), the parties have consented to the

24   jurisdiction of the Magistrate Judge to conduct all proceedings

25   in this matter, including ordering the entry of final judgment.[1]

26   The matter is currently before the Court on the parties' briefs,

27
28
         [1] The District Judge ordered the case assigned to the Magistrate Judge on June 14, 2004.

1

which have been submitted without oral argument to the Honorable

Sandra M. Snyder, United States Magistrate Judge.

## PRIOR PROCEEDINGS

On August 30, 2000, Plaintiff protectively filed for

Supplemental Security Income (SSI), alleging disability since

January 1, 2000, due to lupus. (A.R. at 78-84.) Plaintiff's claim

was denied initially and on reconsideration. (Id. at 44-63.)

Plaintiff requested a hearing before an administrative law judge

(ALJ) of the Social Security Administration (SSA). On November

26, 2002, Plaintiff appeared with an attorney and testified

before the ALJ, Rocklin D. Lyons. (Id. at 30, 17.) On January 16,

2003, the ALJ denied Plaintiff's application for benefits. (Id.

at 17-20.) Plaintiff appealed the ALJ's decision to the Appeals

Council. On October 28, 2003, the Appeals Council denied

Plaintiff's request for review. (Id. at 6-7.)

On December 30, 2003, Plaintiff filed the complaint in the

instant action; the administrative record was lodged by Defendant

on June 9, 2004. On December 14, 2004, Plaintiff filed an opening

brief. On January 18, 2005, Defendant filed a brief in

opposition. On March 3, 2005, Plaintiff filed a reply brief.

Plaintiff filed a supplemental brief on September 30, 2005, and

Defendant filed a supplemental opposition on October 12, 2005.

## ADMINISTRATIVE FINDINGS

The ALJ found that Plaintiff's lupus was a severe

impairment, but her depression was only a slight impairment that

had only minimal, if any, effect on her ability to work.

Plaintiff did not have any impairment or combination thereof that

met or equaled the criteria listed in Appendix 1, Subpart P,

Regulations No. 4. Plaintiff retained the residual functional capacity (RFC) to perform light work with little exposure to sunlight. Plaintiff was able to perform her past relevant work as a retail clerk and hospital housekeeper. Thus, she was not disabled.

ISSUES PRESENTED

Reference to the parties' briefs reveals that the following issues are presented for decision:

1) Whether the ALJ's rejection of Plaintiff's credibility was supported by substantial evidence;

2) Whether the ALJ's conclusion that Plaintiff did not have an impairment that met or equaled a listed impairment, including Listings 14.02, 12.04, and 12.06, was supported by substantial evidence;

3) Whether the ALJ's RFC was supported by substantial evidence;

4) Whether the ALJ erred by failing to develop the record of Plaintiff's mental condition;

5) Whether the ALJ's conclusion that Plaintiff's mental impairment was not severe was supported by substantial evidence;

6) Whether the ALJ's rejection of Dr. Duflot's opinion was accompanied by an adequate statement of reasons supported by substantial evidence; and

7) Whether the Court should remand for consideration of new, material evidence.

FACTS[2]

I. Plaintiff's Testimony at the Hearing

Plaintiff testified that she was twenty-eight years old, single, and had a four-year-old daughter for whom she had cared since she was born. (A.R. at 37). She had a driver's license. (Id. at 36.)

Plaintiff had graduated from high school and had been enrolled in a computer class at Cesar Chavez for approximately ten months in 2001, but left before completing it because of her illness. She had attended school six hours per day, five days a week. (A.R. at 34-35.) She last worked in 1999 or 2000 as a community housekeeper; she had worked as a cashier and as a gift wrapper. (Id. at 35-36.)

Plaintiff was first told that she had lupus in 1995. (A.R. at 35.) Dr. Brown was her primary doctor, who had given her annual physicals since 1998. (Id. at 37-38.) She saw Dr. Duflot[3] about every three months for her lupus and was taking three milligrams of Prednisone twice a day, which was reduced from her original dosage. She had gained weight on the medication. She also took CellCept. Her medications made her nauseous and sometimes made her vomit (A.R. at 38-41.) She received no other ongoing treatment, and her treatment had not changed during the previous year. (Id. at 38, 40-41.)

Plaintiff reported that she had difficulty using her hands

---

[2] The Court notes that Plaintiff's brief does not contain a summary of the facts, including the Plaintiff's testimony and the medical evidence, or a statement of the administrative findings. Thus, as Defendant notes in its brief (at 1-2), Plaintiff's brief does not conform to the Court's scheduling order.

[3] The transcript of the hearing indicates that it was Dr. "Deflow," but it appears that this was a phonetic reference to her specialist, Dr. Duflot.

due to cramping if she used them a lot. She lived alone with her daughter and cooked, cleaned, and did household chores such as laundry and dishes for at least three hours a day; she shopped and drove her daughter to and from pre-school each day. She received $500.00 in aid monthly but had to work an hour and half per day in the school cafeteria, handing out packets and maintaining order. (Id. at 40-42.) Dr. Duflot had limited her to only an hour and one-half per day, Monday through Friday; he had written a letter to AFDC or CalWorks indicating that he did not want her to participate in the "return to work" program until August of the following year because of her lupus. (A.R. at 41-43.) When she was not working, she lay down. (A.R. at 39-40.)

II. Medical History

Plaintiff submitted records from W. L. Brown, M.D., from January 1999 through June 2000. Plaintiff's initial physical in 1999 was normal, and she declined a physical examination in June 2000. (A.R. at 139-43.)

Plaintiff submitted records from the Fresno Community Hospital for the period of February 1999 through September 2000. (A.R. at 152-204.) In April 2000, Plaintiff reported abdominal pain and cramping, nausea, and vomiting. Her physical and mental examinations were normal. (Id. at 176, 182-86.) In May 2000, Plaintiff was seen for a facial rash that occurred after she popped a pimple on her nose. (Id. at 173.) Her physical and mental examination was otherwise normal, and the impression was impetigo. (A.R. at 175, 177-80.)

On August 2000, a CT-guided needle biopsy of her left kidney

1   revealed lupus nephritis, class IV. (A.R. at 288-90.)

2       On September 8, 2000, Plaintiff reported to the emergency
3   room for her rash. (Id. at 159-67.) Her physical examination was
4   otherwise normal, and the impression was acute allergic reaction.
5   (Id. at 166-68.) She reported being under a lot of stress, and
6   there was a notation for a prescription for Prednisone, 20
7   milligrams. (Id. at 166.) Two days later, she reported recent
8   chemotherapy, and her Prednisone dosage was increased. (Id. at
9   161-63.)

10      On September 21, 2000, Plaintiff reported having
11  intermittent blood in her urine and back pain. (Id. at 152-54.)
12  Plaintiff had undergone a kidney biopsy in August 2000. (Id. at
13  145-50, 152.)

14      Plaintiff submitted records from the Fresno County Hospital
15  for Mental Health for the period of November 17 to November 20,
16  2000. (A.R. at 205-50.) On November 17, 2000, Plaintiff was
17  admitted by her mother, who reported that Plaintiff was crying
18  uncontrollably, screaming, emptying cabinets, and trashing rooms.
19  (A.R. at 230, 232.) Plaintiff was having auditory and visual
20  hallucinations. (A.R. at 232, 241.) She stated that she wanted to
21  hurt someone. (A.R. at 232.) The next day Plaintiff was
22  interviewed, and her memory was intact, her comprehension fair,
23  and her judgment good to fair. (A.R. at 227.) The following day
24  she reported Prednisone and Vicodin use and a belief that she
25  might be pregnant; she felt the same way during her last
26  pregnancy. (A.R. at 220.) She had an adverse drug reaction to
27  Resperdol while she was taking Benadryl, Atavan, Zoloft, and
28  Prednisone. (A.R. at 217.) It was suspected that Plaintiff's

psychosis could be due to her medical problems because she had
not had psychiatric problems in the past. (A.R. at 216.)
Plaintiff's condition improved with treatment, and upon
discharge on November 28, 2000, she was reported as not psychotic
or depressed. (A.R. at 208-11.) Zyprexa and Neurontin were
prescribed on discharge, and the diagnosis was Axis I: 298.9
psychotic disorder NOS; Axis II: V71.09; Axis III: S.L.E.; Axis
IV: problems with health; Axis V: 45. (A.R. at 209, 214.)
Plaintiff did not participate in follow-up services. (A.R. at
206-07.)

On December 8, 2000, Dr. Duflot reported that Plaintiff had
been admitted to the mental health clinic recently because of
psychiatric problems, having been discharged on Neurontin and
Zyprexa; she had stopped taking Prednisone on her own and was
feeling better from all aspects. The assessment was systemic
lupus with nephritis status post three doses of Cytoxan; and
psychiatric disturbance related to lupus and possibly
medications. The plan was to decrease the Neurontin because Dr.
Duflot was not sure why she was on it, and she was experiencing
increasing lethargy; restart Prednisone; and stabilize her white
count to permit use of CellCept for chronic maintenance of her
lupus. (A.R. at 287.)

On December 8, 2000, Dr. Duflot completed a welfare form. He
indicated that Plaintiff had been disabled from SLE since
November 2000 and would be incapacitated until June 2001. (A.R.
at 355-56.)

In January 2001, Dr. Frank R. Tamura reported that an MRI of
the brain revealed an old right posterior inferior cerebellar

infarct in the distribution of the posterior inferior cerebellar artery; no intracranial masses or abnormal enhancing foci; and paranasal sinus disease. (A.R. at 284-85, 372-73.)

On January 17, 2001, Dr. Duflot reported that Plaintiff was generally doing better, had some sense of depression but improved sense of well-being, was gaining weight and eating well, and denied arthralgias, myalgias, skin rashes, fevers, chills, lymphadenopathy, or oral or genital ulcers. She was alert and had mild moon facies on the face, but she was otherwise normal. Dr. Duflot noted the old infarct on the MRI result and stated that it was possibly related to lupus anticardiolipin; otherwise, the MRI was unremarkable. The impression was that the Plaintiff's lupus nephritis was stabilized on Prednisone and Cytoxan with resolution of leukopenia. (A.R. at 282-83.)

On February 15, 2001, Plaintiff reported to Dr. Duflot some headaches on the right side, but no fevers, chills, or other indications that her lupus was bothering her. The impression was lupus nephritis improving or stabilized; the plan was to decrease Prednisone, continue CellCept, and prescribe Amoxicillin for probable sinusitis. (A.R. at 278.)

On June 14, 2001, Dr. Duflot noted complaints of Cushingoid features, moon facies, and acne; however, Plaintiff had no more neurologic symptoms and was not having too much difficulty with her joints. She reported severe depression and occasional suicide ideations without plans to effectuate them. She was alert and oriented; she had gained twenty-five pounds in the past year and had truncal obesity. The impression was systemic lupus erythematosus versus mixed connective tissue disease with a

8

positive SSA antibody and ENA as well; history of cerebral vasculitis and stroke in the right posterior cerebellum, history of cerebral vasculitis, stable; Cushingoid features with acne and obesity; and depression. He decreased her Prednisone; increased CellCept, added Zoloft and Plaquenil, and referred her to mental health with a strong admonition to go immediately as well as to consider lupus support groups. (A.R. at 275-76.)

A report dated June 19, 2001, from Dr. Duflot was identical. (A.R. at 273-74.)

On July 3, 2001, Dr. Duflot completed a medical source statement regarding Plaintiff's physical condition. He opined that she could occasionally and frequently lift and carry less than ten pounds based on her SLE-active; stand and/or walk with normal breaks less than two hours in an eight-hour workday; sit less than six hours of an eight-hour workday because of her SLE-active; never climb, balance, stoop, kneel, crouch, crawl; engage in limited reaching, handling, fingering, feeling, seeing, hearing, and speaking, due to lupus cerebritis; and avoid heights, moving machinery, extreme temperatures, chemicals, and dust due to active SLE and lupus cerebritis. Her prognosis was fair. (A.R. at 271-72.)

On August 2, 2001, Plaintiff reported to Dr. Duflot that she was feeling better; her concentration and depression were better, and she had declined to go to mental health the previous month. She had stopped the Zoloft on her own. She was alert and in no acute distress. The impression was lupus nephritis with stable kidney function on CellCept and Prednisone with continued activity; cerebritis with a positive SSA antibody, which could be

consistent with a possible high risk for strokes; and mild
hypokalemia, dietary related. The plan was to continue
medications. Dr. Duflot had tried to refer her to a
rheumatologist on multiple occasions, but she declined, and he
stated he would insist only if her labs and clinical situation
worsened. (A.R. at 269-70.)

On August 28, 2001, Dr. Edward Mosley completed an internal
medicine evaluation at the request of the department after
reviewing medical records. (A.R. at 251-55.) Plaintiff complained
that she was chronically fatigued, with two good days for every
five bad days; she experienced muscle cramps and spasms in her
wrists, fingers, ankles and knees precipitated by any type of
activity engaged in for more than ten to fifteen minutes. She was
extremely sensitive to the sun. She relied on her mother to do
most of the housework, shopping, and some care of Plaintiff's
daughter.

Dr. Mosley found that the physical examination of Plaintiff,
who was five feet tall and weighed 148 pounds, was normal. The
neurological exam showed good motor tone bilaterally with good
active motion; strength was 5/5 in all extremities; cranial
nerves were intact. His impression was systemic lupus
erythematosus. However, there were no objective findings on which
to base any restriction of Plaintiff's physical activities. He
stated, however, that her history of this condition and the
natural course of progression of the condition should be taken
into consideration. (A.R. at 254-55.)

On September 18, 2001, Plaintiff reported a mild rash and
occasional arthralgia. She was not depressed. She denied any

nausea, vomiting or diarrhea. She was alert, oriented, and in NAD. Her mentation was normal, and neurologically she had improved; she denied suicidal ideations or depression. Dr. Duflot reported that her lupus was reported as stable and improved, her blood work was normal, and her Prednisone dose was reduced. (A.R. at 267-68.)

On September 27, 2001, Plaintiff was given a psychological evaluation by Shireen R. Damania, M.D., board certified psychiatrist, at the request of the department. (R.T. at 257-61.) Dr. Damania reviewed Plaintiff's records from her psychiatric admission in November 2000. Plaintiff reported having lupus, joint pain, and headaches; she complained of being weak, tired, and nauseous. (Id. at 257.) Plaintiff stated that she was not receiving any psychiatric care and that she was living with her mother, who did most of the chores and looked after her daughter. Plaintiff stated that she did sometimes feel "depressed and down" because of her situation; she had once weighed 100 pounds, had gained sixty pounds, and by the time of the exam was down to 147 pounds; her long, thick hair had started falling with chemotherapy. Sometimes she had difficulty sleeping.

Dr. Damania noted that Plaintiff was "immaculately groomed." Her mental status examination was normal. She was of average intelligence, fair insight and judgment, appropriate affect, normal attention span, intact memory for recent and past recall, and oriented to time, place, and person. There was no evidence of a thought disorder. Her mood was depressed, and she once became somewhat tearful when describing her situation. Dr. Damania found her to appear mildly depressed.

11

1    Dr. Damania diagnosed Axis I: adjustment disorder, with

2 depressed mood, 309.0; Axis II: no diagnosis; Axis III: 1)

3 systemic lupus by history; 2) headaches by history; Axis IV:

4 moderate psychosocial stressors (unemployed, chronic fatigue);

5 Axis V: G.A.F. current-55; highest in past year-55.

6    Dr. Damania found Plaintiff had no difficulties with memory,

7 concentration, persistence, or pace; there was no evidence of

8 emotional lability. She was able to carry out simple, as well as

9 one- and two-step, instructions; she could respond appropriately

10 to co-workers, supervisors, and the public. Any difficulties in

11 responding to usual work situations or dealing with changes in a

12 routine work setting were the result of the subjective symptoms

13 of chronic fatigue. (A.R. at 259-60.)

14    On October 18, 2001, Dr. Ronald M. Moore, a state medical

15 consultant, completed a physical RFC assessment of Plaintiff's

16 lupus with history of cerebral vasculitis. He opined that

17 Plaintiff could occasionally lift twenty pounds; frequently lift

18 ten pounds; stand, sit, and/or walk about six hours in an eight-

19 hour workday; and engage in unlimited pushing and pulling. He

20 reasoned that Plaintiff's examinations in June 2001 and August

21 2001 were essentially normal, with normal strength, reflexes,

22 range of motion, pulses, and gait, and with no neurological

23 deficits or joint pains; and she appeared stable on medication.

24 There were no postural, manipulative, visual, or communicative

25 limitations; due to her lupus, she should avoid moderate exposure

26 to sunlight. More weight was given to the consultative examiners

27 because the treating physician imposed very severe restrictions,

28 and he failed to return phone calls numerous times. Subjective

symptoms were considered because of Plaintiff's having a medically determinable impairment, and it was concluded that a light RFC with environmental restrictions would be appropriate. (A.R. at 306-13.)

Dr. Glenn Ikawa, M.D., a state medical consultant, completed a psychiatric review technique on October 22, 2001. The conclusion was that Plaintiff's impairment of adjustment disorder with depressed mood was not severe. He opined that the psychosis for which Plaintiff was hospitalized might have been due to the Prednisone. (A.R. at 292-305.)

On October 31, 2001, Dr. Duflot saw Plaintiff, who had suffered a cold and cough, visited the emergency room, and had been prescribed Zithromax, which made her feel better. The impression was stable lupus nephritis. The plan was to reduce Prednisone, continue CellCept, and prescribe Cipro for bronchitis. (A.R. at 265.)

On December 18, 2001, Dr. Duflot reported that Plaintiff's Prednisone had been decreased, and she had no lupus symptomology, arthralgia, rash, or edema; the impression was stable renal function with lupus nephritis and lupus cerebritis, as well as leukopenia. (A.R. at 371, 263.)

On January 22, 2002, Dr. Duflot reported Plaintiff was doing much better. She had no nausea or vomiting. She was alert and in NAD. The impression was lupus with lupus nephritis, stable renal function with mild proteinuria, and mild leukopenia improved since December. Her medications were continued, and her Prednisone was decreased. (A.R. at 370.)

On March 14, 2002, a state agency physician whose name is

13

illegible reviewed the file and the psychiatric review technique assessment of October 22, 2001, and affirmed it as written. (A.R. at 292.)

On May 9, 2002, Dr. Duflot wrote a letter on Plaintiff's behalf, stating that due to her immunosuppressive therapies and her lupus kidney disease and lupus cerebritis, she should only work forty hours per month. (A.R. at 367.) Dr. Duflot's medical notes of that date indicated that Plaintiff's lupus symptoms were minimal, and her lupus nephritis was stable, with no arthralgia or rashes. She was alert, oriented and in NAD; medication was continued. (Id. at 365.) For her depression, she was referred to mental health. (Id. at 365-66.)

On August 7, 2002, Dr. Duflot reported Plaintiff felt weak and was having some aches and pains in her thighs when she ran, but she was not exercising at all. She appeared alert and oriented and in NAD. Plaintiff was to return in three months. The impression was stable lupus nephritis with normal serum albumin. Lamisil was prescribed for toenail fungus, and her other medications were continued. (A.R. at 364.)

On November 19, 2002, Dr. Duflot completed a physical medical report, having last treated her on August 7, 2002. He stated that she had lupus cerebritis, lupus nephritis, and mild cognitive deficits due to cerebritis. Laboratory data were attached. Her response to treatment was favorable, and her prognosis was fair; she could lift twenty pounds occasionally, sit three hours at a time and a total of four hours in a workday; stand/walk one hour at a time and total in a workday; and lie three hours at a time and total in a workday; the medical

14

findings that supported the assessment were concentration,
cognitive deficits, and fatigue. Plaintiff's hands or feet were
not affected. She could never climb, stoop, crouch, or kneel, and
only occasionally balance and crawl; no findings supporting this
assessment were listed. She could never push or pull and could
occasionally reach, handle, feel, and speak, and could frequently
hear. Again, no findings were listed to support the assessment.
Environmental restrictions included avoiding all exposure to
heights, moving machinery, chemicals, noise, dust, fumes,
vibrations, and extreme temperatures; and no restrictions as to
humidity. Dr. Duflot noted that the restricted items would
aggravate her lupus. (A.R. at 357-63.)

SCOPE AND STANDARD OF REVIEW

        Congress has provided a limited scope of judicial review of
the Commissioner's decision to deny benefits under the Act. In
reviewing findings of fact with respect to such determinations,
the Court must determine whether the decision of the Commissioner
is supported by substantial evidence. 42 U.S.C. § 405(g).
Substantial evidence means "more than a mere scintilla,"
Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a
preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10
(9th Cir. 1975). It is "such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."
Richardson, 402 U.S. at 401. The Court must consider the record
as a whole, weighing both the evidence that supports and the
evidence that detracts from the Commissioner's conclusion; it may
not simply isolate a portion of evidence that supports the
decision. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

15

It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. <u>See,</u> <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 510 (9th Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th Cir. 1987).

<u>ANALYSIS</u>

I. <u>Disability</u>

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the

claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities; 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations; 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work; and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful

1  and substantial work within the economy. See 20 C.F.R. §

2  416.920.[4]

3      II. Rejection of Plaintiff's Credibility

4

5      Plaintiff attacks as deficient the ALJ's rejection of the

6  extent of Plaintiff's claimed subjective symptoms.

7      Although Plaintiff claims that the ALJ ignored or misstated

8  Plaintiff's testimony, Plaintiff does not summarize that

9  testimony or indicate in what respect the decision was

10  insufficient. Plaintiff's contention is in violation of paragraph

11  11(f) of the Court's scheduling order and will not be further

12  addressed.

13     The ALJ stated that he had considered Plaintiff's subjective

14  complaints; she had impairments that could reasonably be expected

15  to produce some of the symptoms she alleged, but the degree of

16  limitation was not supported by the objective medical evidence

17  and was not entirely credible when evaluated under Social

18  Security Ruling 96-7p. (A.R. at 18.) The ALJ further stated:

19         The claimant testified that lupus was diagnosed in 1995
           and daily takes Prednisone and Cellcept, which allegedly
20         produce side effects of nausea and vomiting. She admitted
           that even though she claimed her hands "cramp up", she
21         cooks and cleans 3 hours a day, drives a car, shops
           and does laundry. She said she lives with her 4-year-old
22         daughter, takes her to and from school and provides
           for all her needs. She stated that she works 1 and ½ hours
23         per day in the school cafeteria. Weighing all relevant
           factors, the Administrative Law Judge finds that the
24         claimant's impairments are not as limiting as she alleges.

25  (A.R. at 19.)

26     Where, as here, the claimant introduces medical evidence of

27

28  _____

   [4] All references are to the 2003 version of the Code of Federal Regulations unless otherwise indicated.

1  an underlying impairment that could reasonably be expected to

2  produce some degree of the subjective symptoms, the Commissioner

3  may not discredit the claimant's testimony as to subjective

4  symptoms merely because they are unsupported by objective

5  evidence such as objective medical findings. Lester v. Chater, 81

6  F.3d 821, 834 (9th Cir. 1995); Smolen v. Chater, 80 F.3d 1273,

7  1282 (9th Cir. 1996). Unless there is affirmative evidence

8  tending to show that the claimant is malingering, the reasons for

9  rejecting the claimant's testimony must be clear and convincing,

10 and the ALJ must set forth the rejection by identifying what

11 testimony is not credible and what evidence undermines the

12 claimant's complaints. Lester v. Chater, 81 F.3d at 834. The

13 findings of the adjudicator must be properly supported by the

14 record and must be sufficiently specific to allow a reviewing

15 court to conclude that the adjudicator rejected the claimant's

16 testimony on permissible grounds and did not arbitrarily

17 discredit a claimant's testimony. Bunnell v. Sullivan, 947 F.2d

18 341, 345-46; Byrnes v. Shalala, 60 F.3d at 641-42 (9th Cir.

19 1995); see 20 C.F.R. § 416.929(c).

20      Social Security Ruling 96-7p directs the adjudicator to

21 consider not only objective medical evidence of signs, laboratory

22 findings, and medical opinions, but also the following factors

23 when assessing the credibility of an individual's statements:

24      1. The individual's daily activities;
        2. The location, duration, frequency, and intensity
25         of the individual's pain or other symptoms;
        3. Factors that precipitate and aggravate the symptoms;
26      4. The type, dosage, effectiveness, and adverse
           side effects of any medication for pain or other
27         symptoms;
        5. Treatment, other than medication, for relief of
28         pain or other symptoms;

1   6. Any measures other than treatment used by the
         individual to relieve the pain or other symptoms; and
2   7. Any other factors concerning the individual's
         functional limitations and restrictions due to
3         pain or other symptoms.

4   See also Bunnell v. Sullivan, 947 F.2d at 346.

5       Here, the ALJ identified Plaintiff's claims of side-effects

6   of medication, including nausea and vomiting, and of cramping of

7   her hands. He relied on her own testimony about her activities of

8   daily living, including working for an hour and one-half,

9   cleaning and doing laundry for three hours, driving, shopping,

10  and providing for her daughter's needs. A claimant's ability to

11  engage in activities of daily living to the extent that he or she

12  spends a substantial part of her day engaged in pursuits

13  involving the performance of physical functions that are

14  transferable to the work setting is relevant; a specific finding

15  as to this fact may be sufficient to discredit a claimant's

16  allegations. Morgan v. Commissioner of Social Sec. Admin., 169

17  F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart, 278 F.3d 947,

18  959 (9th Cir. 2002).

19      Further, the ALJ noted that her complaints were not

20  supported by objective medical evidence. Although the

21  inconsistency of objective findings with subjective claims may

22  not be the sole reason for rejecting subjective complaints of

23  pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is

24  one factor which may be considered with others, Moisa v.

25  Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v.

26  Commissioner 169 F.3d 595, 600 (9th Cir. 1999). The ALJ expressly

27  noted the stability and improvement of Plaintiff's condition and

28  the lack of any objective findings in the treatment record that

would support a conclusion that she was disabled. Substantial evidence supports this conclusion, as is more fully discussed in the analysis of the soundness of the ALJ's conclusion as to RFC. As to nausea, the Court notes that Plaintiff did not report nausea to Dr. Duflot; indeed, she denied nausea in January 2002.

Plaintiff argues that the ALJ failed to consider all seven criteria listed in Social Security Ruling 96-7p. However, it is established that where the evidence supporting an ALJ's rejection of a claimant's credibility is substantial, and where the findings demonstrate that the ALJ did not arbitrarily reject the Plaintiff's testimony, the finding will be upheld even though the finding is not as extensive as possible and does not consider all possible factors. Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) (where the AlJ's conclusion was based on the claimant's daily activities, treating therapist's notes, and good response to treatment); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999) (upholding an ALJ's rejection of a claimant's credibility based on medical evidence, daily activities, and Plaintiff's testimony that a medication aided intermittent pain).

The Court concludes that the ALJ stated clear and convincing reasons, supported by substantial evidence, in support of his rejection of Plaintiff's credibility.

III. Listed Impairments

Plaintiff asserts that the ALJ erred in not reviewing listings 14.02, 12.04, and 12.06.

It is Plaintiff's burden to establish that his impairment met a listing. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). Mere diagnosis of a listed impairment is not sufficient to

21

sustain a finding of disability; there must also be the findings
required in the listing. Young v. Sullivan, 911 F.2d 180, 183
(9th Cir. 1990); 20 C.F.R. § 416.925(d). Generally, specific
medical findings are needed to support the diagnosis and the
required level of severity. 20 C.F.R. § 416.925(c). The
Commissioner is not required to state why a claimant failed to
satisfy every different section of the listing of impairments;
rather, it is sufficient to evaluate the evidence upon which the
ultimate factual conclusions are based. Otherwise, an undue
burden would be put on the social security disability process.
Gonzales v. Sullivan, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

   The ALJ expressly found that Plaintiff had no impairment or
combination thereof meeting or equaling the criteria under any
section of Appendix 1, Subpart P, Regulations No. 4. (A.R. at
17.)

   Substantial evidence supported the ALJ's finding that
Plaintiff's symptoms did not meet or equal a listing. Listing
12.04 (Affective Disorder) was not met because Plaintiff's
occasional symptoms of depression and single hospitalization for
psychosis, which was suggested to be a result of drug ingestion
by the treating physician and a state agency physician, did not
constitute sufficiently persistent symptoms or sufficiently
numerous types of symptoms for the "A" requirements; did not
result in marked difficulties or repeated episodes of
decompensation within the scope of the "B" requirements; and did
not exhibit the required chronicity or severity of impairment of
adjustment or functionality required by the "C" requirements of
the listing.

1    Substantial evidence supported the finding that Plaintiff
2    did not meet listing 12.06 (Anxiety Related Disorders). There is
3    no indication that Plaintiff suffered anxiety, phobia, obsession,
4    compulsion, panic or any of the associated symptoms or signs that
5    would render any of her mental symptoms sufficient under this
6    listing, and there is likewise no evidence that there was any
7    resulting restriction at all in the required activity or areas of
8    functioning, let alone restrictions to the extent required by the
9    listing. Further, the Plaintiff has the burden of establishing a
10   prima facie case of disability, which requires a showing that the
11   Plaintiff not only has a listed impairment, but also of the
12   twelve-month continuous duration requirement. Roberts v. Shalala,
13   66 F.3d 179, 182 (9th Cir. 1995) (cert. denied, Roberts v.
14   Chater, 517 U.S. 1122 (1996); see, 42 U.S.C. § 1382c(a)(3)(A); 20
15   C.F.R. §§ 416.909, 416.920(d). Plaintiff has not made a prima
16   facie showing of disability under listing 12.06.

17   With respect to Plaintiff's meeting listing 14.02 (Systemic
18   lupus erythematosus), in supplemental briefing, Plaintiff
19   asserted that Plaintiff was most appropriately evaluated under
20   subsection "B," admitted that none of the sections appeared to be
21   fully met, but argued there was significant involvement in the
22   skin, renal, neurological, and mental systems.

23   Section 14.00 of Part 404, Subpart P, Appendix 1[5] concerns
24   listed impairments of the immune system. Section 14.00(B)
25   provides that to permit appropriate application of a listing, the
26   specific diagnostic features that should be documented in the
27
28

---

[5] All references are to the 2003 version of the Code of Federal Regulations.

clinical record for each of the disorders are summarized for

systematic lupus erythematosus (SLE).

Title 20 C.F.R. § 14.00(B)(1) provides:

1. Systemic lupus erythematosus (14.02)--
This disease is characterized clinically by
constitutional symptoms and signs (e.g., fever,
fatigability, malaise, weight loss), multisystem
involvement and, frequently, anemia, leukopenia, or
thrombocytopenia. Immunologically, an array of
circulating serum auto-antibodies can occur, but are
highly variable in pattern. Generally the medical evidence
will show that patients with this disease will fulfill
The 1982 Revised Criteria for the Classification of
Systemic Lupus Erythematosus of the American College of
Rheumatology. (Tan, E.M., et al., Arthritis Rheum.
25:11271-1277, 1982).[6]

Section 14.02, subsection A, Systemic lupus erythematosus,
provides:

Documented as described in 14.00B1, with:
    A. One of the following:
    1. Joint involvement, as described under the criteria
in 1.00;or
    2. Muscle involvement, as described under the criteria
in 14.05; or
    3. Ocular involvement, as described under the criteria
in 2.00 ff; or
    4. Respiratory involvement, as described under the
criteria in 3.00ff; or
    5. Cardiovascular involvement, as described under the
criteria in 4.00ff or 14.04D; or
    6. Digestive involvement, as described under the
criteria in 5.00FF; or
    7. Renal involvement, as described under the criteria
in 6.00ff; or
    8. Hematologic involvement, as described under the
criteria in 7.00ff; or
    9. Skin involvement, as described under the criteria
in 8.00ff; or
    10. Neurological involvement, as described under the
criteria in 11.00ff; or
    11. Mental involvement, as described under the criteria
in 12.00ff.

Plaintiff does not mount an argument that her condition

reflected the relatively severe symptoms or loss of functioning

[6] No medical expert or party has brought any portion of the 1982 revised criteria before the Court.

24

set forth in the sections referred to in § 14.02(A). However, she would meet the listing if, in the alternative, she demonstrated the requisite requirements of paragraph 14.02(B), which provides:

> B. Lesser involvement of two or more organ/body systems listed in paragraph A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organs/body systems must be involved to at least a moderate level of severity.

Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.02(B).

Plaintiff asserts that there is significant involvement in the skin, renal, neurological, and mental systems.

The involvement according to the listing must be moderately severe. Id. However, the term "severe" in the listings is used to describe medical severity; the term does not have the same meaning as it does when used in connection with a finding at the second step of the sequential evaluation. Id., § 14.00(B).

The only symptoms of skin involvement in the record before the Court are an instance of impetigo after breaking a blemish in May 2000, a rash due to extreme allergic reaction in August 2000, and a mild rash in September 2001. There is no indication that this was categorized medically as moderately severe by any of the physicians.

Plaintiff asserts that her prior cerebral infarction constituted an impact on her neurological condition. However, it is not clear that this was related to Plaintiff's lupus; Dr. Duflot opined in January 2001 that the old infarct was "possibly related to lupus anticardiolipin antibody." (A.R. at 282.) Further, there is no indication that this prior phenomenon was

moderately severe or had any specific effect on Plaintiff's health or functioning; her history of stroke and cerebral vasculitis was described as "stable" in June 2001. (A.R. at 274, 276.)

As to her renal symptoms, Plaintiff's medical history shows that she had lupus nephritis, but Plaintiff's condition was repeatedly described by her treating physician as being stable throughout 2001 and 2002. Plaintiff's medication had been decreased by the time of the hearing; Plaintiff declined Dr. Duflot's offer of a referral to a rheumatologist, and Dr. Duflot himself declined to require her to seek further treatment.

Finally, the record lacks evidence that Plaintiff's mental condition was considered to be moderately severe or sufficiently significant to qualify under the listing.

In summary, Defendant correctly contends that the ALJ's decision regarding Plaintiff's not meeting a listing contained adequate findings and was supported by substantial evidence in the record.

IV.   <u>Severity of Plaintiff's Mental Impairment and Development of the Medical Record of Mental Impairment</u>

The ALJ found that Plaintiff's depression was slight and that it had only minimal, if any, effect on her ability to work. Plaintiff points to the evidence that Plaintiff had been admitted to a PACT unit and had been gravely disabled, (A.R. at 257-59); further Dr. Damania found that Plaintiff was limited to simple, repetitive (one- and two-step) tasks, (A.R. at 259), and had a GAF of 55. Plaintiff asserts that Dr. Damania's report is inconsistent because Damania found that Plaintiff had no mental

limitation except not doing more complex tasks, and yet also concluded that there was a GAF of 55, which Plaintiff asserts is consistent with multiple moderate limits. Plaintiff further argues that the ALJ breached his duty to develop the mental health record fully because Damania did not get updated records of ongoing symptoms consistent with disability, (A.R. at 259).

At step two, the Secretary considers if claimant has an impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c). This is referred to as the "severity" requirement and does not involve consideration of the claimant's age, education, or work experience. Id. The Secretary is required to consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity." 42 U.S.C. § 1382c(a)(3)(F).

Basic work activities include the abilities and aptitudes necessary to do most jobs, including capacities for understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921(b).

An impairment or combination thereof is not severe when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work

activities. 20 C.F.R. § 416.921(a); Soc. Sec. Ruling 85-28;

Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996).

Here, the ALJ stated:

Dr. Duflot also intermittently reported that the
claimant was depressed and has prescribed medication
for the condition, but the claimant declined his mental
health referrals and she currently takes no related
medication....

(A.R. at 18.) The Court notes that the record supports the ALJ's

statements; Plaintiff's sense of depression had improved in

January 2001; her depression in June 2001 was treated with

Zoloft, which Plaintiff had discontinued on her own by August

2001, when she reported that her depression was better. In

September 2001 she denied depression to Dr. Duflot. In January

and August 2002 she was alert and in no acute distress. At the

times she complained of depression, she failed to follow-up on

her treating physician's referral to mental health. This evidence

supports a conclusion that Plaintiff's intermittent depression

was not a severe impairment.

The ALJ also noted Dr. Damania's examination and assessment.

Dr. Damania found Plaintiff to have fair insight and judgment,

normal attention span, and intact memory; although Plaintiff

appeared mildly depressed, there was no evidence of a thought

disorder, and Damania expressly found no difficulties with

memory, concentration, persistence, pace, response to co-workers,

supervisors, or the public. Damania expressly found that

Plaintiff was able to understand, carry out, and remember simple

as well as one- and two-step job instructions. Aside from

subjective symptoms of chronic fatigue, there were no

difficulties in responding to usual work situations or dealing

with changes in a routine work setting.

The ALJ expressly noted this assessment as well as Damania's GAF of 55. The GAF, or global assessment of functioning, of 55 attributed to Plaintiff by Dr. Damania does not mandate a conclusion that Plaintiff suffered a severe impairment. A GAF is a report of a clinician's judgment of the individual's overall level of functioning and is used to plan treatment and to measure the impact of treatment as well as predicting its outcome. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 30 (4th ed.). A GAF of 55 is reflects moderate symptoms or moderate difficulty in social or occupational functioning. (Id. at 32.) A GAF does not have a direct correlation to the severity requirements in the SSA listings of mental disorders. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. 50746, 50764-65 (August 21, 2000). The ALJ properly relied on Dr. Damania's express findings with respect to Plaintiff's capacity to perform work activities.

Although earlier law required an ALJ to complete a psychiatric review technique form and append it to the decision, the 2003 version of the regulations requires only that at the administrative law judge hearing and Appeals Council levels, the SSA will "document application of the technique in the decision." 20 C.F.R. § 416.920a(e) (SSI); see also 20 C.F.R. § 404.1520a(e) (DIB). Thus, actual use of the review technique form itself is no longer required. (Compare, Gutierrez v. Apfel, 199 F.3d 1048, 1050 (9th Cir. 2000) (requiring a remand where an ALJ failed to comply).

1    Here, in light of the requirements of § 416.920a(c) and (d),

2  the ALJ made adequate findings regarding Plaintiff's having a

3  mental impairment. The ALJ rated Plaintiff's functional

4  impairment, expressly concluding that there were no mental

5  limitations. The ALJ recited Plaintiff's activities of daily

6  living, including cooking, cleaning, driving, shopping, laundry,

7  childcare, and work at the school. The ALJ recited Dr. Damania's

8  findings that Plaintiff was pleasant, cooperative, appropriate,

9  and related well. He further recited Damania's conclusions that

10  Plaintiff had no difficulties in memory, concentration,

11  persistence, or pace; had no emotional lability; could perform

12  simple repetitive tasks and one- and two-step instructions; and

13  had all the other requisite work-related abilities. (A.R. at 19.)

14  Damania's conclusions supported the ALJ's findings. (A.R. at 259-

15  260.) Although the ALJ did not make an express finding regarding

16  episodes of decompensation, there do not appear to have been any

17  episodes of decompensation other than Plaintiff's one hospital

18  admission for psychosis, which was referred to in Damania's

19  report. The findings were consistent with a finding of non-severe

20  impairment pursuant to § 416.920a(d)(1). The Court thus concludes

21  that the ALJ applied the appropriate criteria and made adequate

22  findings with respect to Plaintiff's functional limitations from

23  her mental impairment.

24    As to the adequacy of the record before the ALJ, it is

25  established that the duty to develop the record arises where the

26  record before the ALJ is ambiguous or inadequate to allow for

27  proper evaluation of the evidence. 20 C.F.R. § 416.912(e); Mayes

28  v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001). There is no

indication that Plaintiff's psychotic symptoms were anything
other than a single, isolated incident. With respect to the
depression, as previously noted, it is the Plaintiff's burden to
demonstrate disability; there is no indication of any inadequacy
or ambiguity of the record regarding Plaintiff's depression.

Accordingly, it is concluded that the ALJ did not fail in a
duty to develop the record of Plaintiff's mental condition.

V. <u>Sufficiency of the Evidence to Support the RFC</u>

Plaintiff argues that the state agency physicians'
assessments were insufficient evidence because they were "fill-
in-the-blank" forms, dated, inconsistent with the overall
evidence, and not based on the entire evidence; Dr. Mosley's
opinion was based on improper diagnosis and was inconsistent with
the record. Plaintiff argues that the ALJ erred in rejecting the
opinion of Dr. Duflot. Thus, the ALJ's RFC was not supported by
substantial evidence.

An ALJ may disregard a treating physician's opinion that is
controverted by other opinions only by setting forth specific,
legitimate reasons for doing so that are based on substantial
evidence in the record. <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 762
(9th Cir. 1989). This burden is met by stating a detailed and
thorough summary of the facts and conflicting clinical evidence,
stating the interpretation of the evidence, and making findings.
<u>Cotton v. Bowen</u>, 799 F.2d 1403, 1408 (9th Cir 1986). However, if
the medical opinion of a claimant's treating physician is
uncontroverted, then an ALJ must present clear and convincing
specific reasons, supported by substantial evidence in the
record, for rejecting the uncontroverted medical opinion of a

31

claimant's treating physician. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1203 (9th Cir. 2001). It is insufficient to rely on the inability of the physician to support the findings with objective laboratory findings because disability may be proved by medically acceptable clinical diagnoses as well as by objective laboratory findings. <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 762 (9th Cir. 1989). A failure to set forth a reasoned rationale for disregarding a particular treating physician's findings is legal error. <u>Cotton v. Bowen</u>, 799 F.2d at 1408.

Likewise, the medical opinion of a nontreating doctor may be relied upon instead of that of a treating physician only if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record. <u>Id.</u> at 1202, citing <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). The contradictory opinion of a nontreating but examining physician constitutes substantial evidence, and may be relied upon instead of that of a treating physician, where it is based on independent clinical findings that differ from those of the treating physician. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). The opinion of a nontreating, nonexamining physician can amount to substantial evidence as long as it is supported by other evidence in the record, such as the opinions of other examining and consulting physicians, which are in turn based on independent clinical findings. <u>Andrews v. Shalala</u>, 53 F.3d at 1041.

The ALJ noted that the clinical notes established that Plaintiff's condition was stable with minimal or no symptoms. (A.R. at 18.) The record, as detailed above, supports this conclusion.

The ALJ rejected Dr. Duflot's opinion of December 2000 that Plaintiff had been disabled since November 2000 because Duflot did not indicate what work-related activities Plaintiff could perform, or why she could not work. It is established that a conclusory opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). Further, even where an expert's report identifies characteristics that might limit a claimant's ability to perform work on a sustained basis, if the report fails to explain how such characteristics preclude work activity in the claimant's case, it is appropriate and adequate for an ALJ to 1) determine that the level of impairment stated is unreasonable in light of the symptoms and other evidence in the record, and 2) set forth that analysis. See Morgan v. Commissioner of Social Security 169 F.3d 595, 601 (9th Cir. 1999). The ALJ was not bound to accept the opinion of Dr. Duflot given Duflot's failure to address Plaintiff's capacities or explain how Plaintiff's disease precluded her from working.

The ALJ rejected Dr. Duflot's statement of July 2001 to the effect that Plaintiff could lift only ten pounds, stand and walk less than two hours, sit less than six hours per eight-hour day, and never climb, balance, stoop, kneel, crouch, or crawl; the ALJ noted that the only finding supporting the opinion was the diagnosis of lupus. Again, this was a legitimate reason for failing to give Dr. Duflot's opinion controlling weight. The ALJ then noted that by November 2002, Duflot had found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, sit four hours and stand or walk one hour with

33

occaional balancing and crawling; Duflot noted that Plaintiff had favorably responded to treatment, and her prognosis was fair. The ALJ then stated:

> The Administrative Law Judge has given less weight to Dr. Duflot's opinions than would typically be warranted because Dr. Duflot does not substantiate his conclusions with concrete evidence and the severity of his restrictions is not supported by the treatment record, the claimant's testimony and the opinion of Dr. Mosley discussed below.

(A.R. at 18.) The record supports the ALJ's characterization of the treatment record, which contains no indication of signs warranting the particular restrictions imposed by Dr. Duflot. Likewise, Plaintiff herself admitted that she worked and took care of her home and her daughter.

As to the opinion of Dr. Mosley, the consulting internist, the ALJ noted that although systemic lupus erythematosus was diagnosed, Mosely reported that the entire examination was within normal limits and that there were no objective findings on which to base any restriction of the claimant's physical activities. (A.R. at 18.) This correctly characterizes the objective findings of Dr. Mosley. Dr. Mosley's statement that the history of Plaintiff's condition and the natural course of progression of it should be considered (A.R. at 255) neither undermined the specific objective findings on examination nor presented a clear basis for any specific functional limitations. As previously noted, to the extent that Plaintiff's history was premised on her own subjective complaints, the ALJ adequately rejected the extent of the claimed limitations.

In support of the ALJ's RFC of light work with minimal exposure to sunlight, the ALJ noted the state agency consultant's

34

RFC. Contrary to Plaintiff's contention, the state agency doctor
did not merely check off a form; rather, the doctor expressly
referred to the exams of June and August 2001 that revealed
essentially no "neuro" deficits or joint pain; noted that
Plaintiff appeared stable on medications; and referred to her
strength, reflexes, range of motions, and gait as being within
normal limits. Further, he stated that he had considered the pain
and fatigue as reported by Plaintiff. (A.R. at 307.) The doctor
also expressly stated that more weight was given to the
consultive examiner because the treating physician's evaluation
was very restrictive, and although he had been contracted several
times, he had not returned the telephone calls. Considering
Plaintiff's subjective complaints and her activities of daily
living, a light RFC with environmental restrictions was
considered most appropriate. (A.R. at 312.) Although the state
agency doctor used a form for the opinion that was rendered, the
annotations to the form provided a relatively greater insight
into the objective data relied on in reaching the opinion and the
weight given to the data upon which the opinion was based than
did the form data provided by Plaintiff's treating physician.
(Compare A.R. 355-361.)

     The ALJ articulated legitimate and specific reasons for
placing more weight on the opinions of the consulting and non-
examining doctors; those opinions constituted substantial
evidence that supported the ALJ's conclusion regarding
Plaintiff's RFC.

     VI. <u>Additional Evidence</u>

     Plaintiff attached to her opening brief as Exhibit 1

treatment records from Dr. Duflot and a hospital discharge

summary. Dr. Duflot's treatment records cover various office

visits in 2002 and visits in January, February, March, July,

October, and December 2003. There are also records from an

unidentified facility where Plaintiff visited Dr. Anita

Sivasubramanian in April 2004, in connection with lupus.

Title 42 U.S.C. § 405(g) requires the Commissioner to file,

as part of her answer, "a certified copy of the transcript of the

record including the evidence upon which the findings and

decision complained of are based." If further provides that the

district court "shall have power to enter, upon the pleadings and

transcript of the record," a judgment with respect to the

Commissioner's decision. Section 405(g) is interpreted to require

that the decision rendered by the ALJ be based on evidence in the

record. Burkhart v. Bowen, 856 F.2d 1335, 1341 (9th Cir. 1988)

(holding that the ALJ's reliance on his own experience as to

vocational opportunities constituted reliance on evidence outside

the record and resulted in denial of the aggrieved party's right

of cross-examination, a central component  of due process of

law).

Section 405(g) further provides in pertinent part:

The court may... at any time order additional evidence
to be taken before the Commissioner of Social Security,
but only upon a showing that there is new evidence
which is material and that there is good cause for the
failure to incorporate such evidence into the record
in a prior proceeding....

It is established that it is the burden of the party seeking the

Court to consider the evidence to show that the evidence is

material and probative of the party's condition at the relevant

1  time period, namely at or before the disability hearing. <u>Sanchez</u>

2  <u>v. Secretary of Health and Human Services</u>, 812 F.2d 509, 512 (9th

3  Cir. 1987). Evidence is sufficiently material to require a remand

4  where it bears directly and substantially on the matter in

5  dispute, and it is such that there is a reasonable possibility

6  that the new evidence would have changed the outcome of the

7  Commissioner's determination had it been before the Commissioner.

8  <u>Mayes v. Massanari</u>, 276 F.3d 453, 462 (9th Cir. 2001).

9      To demonstrate good cause, a claimant must demonstrate that

10 the new evidence was unavailable earlier. <u>Mayes v. Massanari</u>, 276

11 F.3d 453, 463 (9th Cir. 2001).

12     Plaintiff has failed to show that any of the records that

13 existed at the time of the administrative hearing on November 26,

14 2002, were unavailable. Plaintiff has failed to demonstrate good

15 cause.

16     Further, Plaintiff has failed to show that the record of

17 post-hearing treatment raised a reasonable possibility that it

18 would have changed the outcome. The records from early 2003 (a

19 time relatively near the November 2002 hearing) generally

20 demonstrate that Plaintiff was doing well but suffered a rash

21 experienced after she failed to take her medication. Her

22 complaints in July 2003 of morning stiffness and cramps were

23 accompanied by a normal neurological examination, normal

24 circulation and pulses, and lack of muscle atrophy; it was

25 reported as an atypical lupus flare. It was not until the autumn

26 of 2003 that Plaintiff reported joint pain in the hands and

27 wrist, and it was not until almost December 2003 (over a year

28 after the hearing and almost a year after the ALJ's decision)

37

1  that Plaintiff was hospitalized for depression; at that time, Dr.
2  Duflot nevertheless reported her lupus symptoms as "currently
3  appearing quiet."

4      Accordingly, the Court rejects Plaintiff's contention that
5  the materials are new and material evidence.[7]

6      VII. <u>Obesity</u>

7      Raising the issue for the first time in her supplemental
8  brief, Plaintiff argues that since obesity was diagnosed[8], it
9  should have been considered, apparently in connection with
10 Plaintiff's testimony.

11     Unless excusing compliance is necessary to avoid a manifest
12 injustice, when claimants are represented by counsel, they must
13 raise all issues and evidence at their administrative hearings in
14 order to preserve them on appeal to the courts. <u>Meanel v. Apfel</u>,
15 172 F.3d 1111, 1115 (9th Cir. 1999). This is because the ALJ,
16 rather than this Court, is in the optimal position to resolve the
17 any issues regarding a claimant's condition. <u>Id.</u>

18     Because Plaintiff has not shown that she raised the issue of
19 obesity before the ALJ or Appeals Council, Plaintiff has waived
20 her right to obtain judicial review of the issue here.

21                         <u>DISPOSITION</u>

22     Based on the foregoing, the Court concludes that the ALJ's
23 decision was supported by substantial evidence in the record as a
24 whole and was based on proper legal standards.

25     Accordingly, the Court AFFIRMS the administrative decision
26
27     [7] Plaintiff is free to file a new application seeking benefits for the later period. <u>See</u> <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 512 (9th Cir. 1987).

28     [8] Plaintiff does not cite to the record in connection with this argument.

of the Defendant Commissioner of Social Security and DENIES

Plaintiff's Social Security complaint.

    The Clerk of the Court IS DIRECTED to enter judgment for

Defendant Jo Anne B. Barnhart, Commissioner of Social Security,

and against Plaintiff Stephanie Lara.


IT IS SO ORDERED.

**Dated:    February 1, 2006         _____/s/ Sandra M. Snyder_____**
icido3                              UNITED STATES MAGISTRATE JUDGE